**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

The Unencumbered Assets, Trust,                 :

        Plaintiffs,                 :
                                       Case No. 2:04-cv-908

      v.                 :
                                         Judge Graham

Great American Insurance Co., et al.,          :

        Defendants.                 :

OPINION AND ORDER

     This action stems from an insurance dispute over the proceeds of an excess directors and officers ("D&O") policy purchased by National Century Financial Enterprises, Inc. from Great American Insurance Company. The policy provided coverage of National Century's directors and officers for claims made against them based on "wrongful acts." The policy also covered National Century itself for claims based on wrongful acts ("entity coverage") .

     On one side of the dispute is Great American, which believes no one is eligible for coverage under the D&O policy. On the other side are those claiming that they are entitled to coverage. These parties include: the Unencumbered Assets Trust ("UAT"), which was created in bankruptcy court to pursue legal causes of action belonging to debtor National Century and its subsidiaries; several of National Century's principal executives (the "Principals"), including Lance Poulsen, Donald Ayers, Roger Faulkenberry, and James Dierker; Lance Poulsen's wife, Barbara Poulsen; and National Century's outside directors, Thomas Mendell, Harold Pote, and Eric Wilkinson.

     Several dispositive motions are pending before the court. The Principals have moved for summary judgment to require the payment of defense costs on the grounds that they have incurred a

loss defending themselves in criminal and civil litigation relating to their wrongful acts at National Century. Both Great American and the UAT oppose the Principals' motions for summary judgment.

Great American has moved for summary judgment against all potential claimants. Its motion relies heavily on the fact that the Principals have been convicted of crimes relating to their roles at National Century. Great American argues that the criminal convictions establish its grounds for denying coverage, namely: (1) rescission of the policy because Poulsen's false representations in the policy application rendered the contract void *ab initio*, and (2) the policy's "dishonesty exclusion" that excluded from coverage a loss brought about by an insured's deliberately fraudulent actions.

Those seeking coverage argue that the Great American policy contained no provision allowing Great American to rescind the policy as void *ab initio* and that, in any event, Great American waived its right to rescind. As to the dishonesty exclusion, the Principals argue that the criminal convictions are not final because appellate review of those convictions has not been exhausted. The UAT admits that the Principals engaged in fraudulent conduct but argues that their wrongdoing should not be imputed to National Century for purposes of entity coverage.

For the reasons set forth below, the court denies the Principals' motions for summary and denies summary judgment to Great American as it pertains to its void *ab initio* argument, but the court grants summary judgment to Great American as to the dishonesty exclusion.

## I.      Pending Procedural Motions

Before reaching the merits of the overarching motions for summary judgment, several procedural motions must be addressed.

### A.      Motion for Leave to Amend

Great American has moved for leave to file an amended counterclaim for rescission. The court originally dismissed one of the rescission counterclaims because it failed under Rule 9(b), Fed. R. Civ. P., to allege with particularity the misrepresentations that were allegedly made in certain financial

2

statements that Poulsen submitted with the insurance proposal form.  See Unencumbered Assets Trust v. Great American Ins. Co., No. 2:04-cv-908, 2007 WL 2029063 (S.D. Ohio July 10, 2007).  The amended counterclaim seeks to cure that pleading defect.

Under Rule 15(a), Fed. R. Civ. P., leave to amend "shall be freely granted when justice so requires."  See Brennan v. Arkay Indus., Inc., 164 F.R.D. 464, 466 (S.D. Ohio 1996).  The Principals fail to identify any prejudice to them if the court grants the motion for leave to amend; however, they do oppose the motion on the grounds that the amendment would be futile.  While their futility objection is better resolved on the merits of the present dispositive motions, the court will briefly explain why leave should be granted.

Under Rule 9(b) averments of fraud and the circumstances constituting the fraud must be stated with "particularity."  To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied.'"  Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).  When the court last examined this issue, Great American's claim lacked sufficient particularity.  Great American alleged that the proposal form incorporated National Century's three most recent annual audited financial statements and its latest interim financial statement, yet only broadly alleged that the documents contained misrepresentations rather than identifying their actual content.

The court finds that Great American's amended counterclaim is sufficiently specific.  The counterclaim now points out that the data in the documents was based on "nearly ten years worth of financial improprieties."  Great American Am. Countercl., ¶ 99.  Great American alleges numerous examples supporting the proposition that the documents were fraudulent.  The counterclaim explains that the financial documents utterly failed to account for National Century's actual financial status and operations.  The amended counterclaim contains no less than seventeen pages of data and events not reflected in the financial documents National Century used in procuring the insurance contract.  See id.,

3

¶¶ 14-82.

Although the court need not recount every part of the amended counterclaim, a few examples are particularly helpful. The counterclaim details that the three annual financial statements and the interim statement Poulsen submitted did not reflect the following: that internal National Century communications highlighted the company's collateral shortfalls over the three year period of the false financial reports, including shortfalls of $45,000,000, id. at ¶ 36, over $100,000,000, id. at ¶ 54, "at least" $85,000,000, id. at ¶ 61, and $511,000,000, id. at ¶ 75. The counterclaim also explains that the financial reports failed to reflect that several National Century executives awarded themselves multi-million dollar bonuses, id. at ¶ 82, and failed to report that the executives wrongfully forwarded millions of dollars to subsidiary companies that they owned, id. at ¶¶ 31-33, 39, 40.

Given the particularity with which Great American highlights inconsistencies between the financial reports and National Century's actual financial status during the years in question, the court thus finds that its amended counterclaim satisfies Rule 9(b). Accordingly, Great American's motion for leave to amend is granted (doc. 67).

### B.    Other Procedural Motions

After Ayers filed a motion for partial summary judgment to require the payment of defense costs, Poulsen moved to join Ayers' motion, and the court now grants Poulsen's motion for joinder (doc. 57). Faulkenberry then moved to intervene in the proceedings to file his own motion for summary judgment; the court also grants this motion to intervene (doc. 62). Dierker filed a motion for the court to consider Federal Rule of Evidence 201 and the doctrine of judicial estoppel as it pertains to the Principals' motions for summary judgment. The court grants this motion (docs. 73, 74) and construes it as Dierker's joinder with the other Principals in their requests for defense costs. In essence, each Principal makes a claim under the Great American policy for coverage relating to the litigation costs they have incurred.

4

The court also grants the following motions: Great American's motion for leave to file a supplemental memorandum opposing Lance Poulsen's request for costs (doc. 83); Great American's motion for an extension of time to file a reply brief (doc. 105); and the Outside Directors' motion to substitute the Estate of Harold W. Pote for defendant Harold W. Pote (doc. 107). Finally, Lance and Barbara Poulsen's motion to strike Great American's filing of a supplemental exhibit—the government's criminal complaint against Lance Poulsen—is denied as moot (doc. 85).

## II. Background

### A. National Century

Although National Century's bankruptcy and the proceedings that followed are well-documented, a brief review of the events before and after the company's financial collapse is appropriate.

Lance Poulsen and Donald Ayers were two of the original founders of National Century in 1990. They owned a controlling stake in National Century and occupied positions of executive authority at all times. Poulsen served as president, chairman, and director; Ayers was vice chairman, chief operating officer, and director. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., __ F.Supp.2d __, 2011 WL 1397813, at *1 (S.D. Ohio Apr. 12, 2011). Barbara Poulsen served as secretary, treasurer, and director. Roger Faulkenberry and James Dierker joined the company after its inception and became executives. Faulkenberry began with National Century in 1994; he served as Director of Securitizations and became Executive Vice-President for Client Development in 2001. See U.S. v. Faulkenberry, 614 F.3d 573, 579 (6th Cir. 2010). Dierker joined in 1999 and was the company's vice president for client development, as well as its chief credit officer. See U.S. v. Poulsen, 568 F. Supp. 2d 885, 901 (S.D. Ohio 2008).

Poulsen and the original founders owned 100% of National Century until July 1998, when the Beacon Group III – Focus Value Fund, L.P. purchased a 19% equity position in the company. This

purchase gave the Focus Value Fund the right to appoint two outside directors to National Century's six-member board; Thomas Mendell, Harold Pote, and Eric Wilkinson served variously as the outside directors.

National Century's business was to purchase accounts receivable at a discount from healthcare providers. Poulsen established several corporate subsidiaries to carry out this task. NPF VI, Inc. and NPF XII, Inc. were wholly-owned subsidiaries formed in Ohio in 1995 and 1999 respectively. They functioned as special-purpose corporations through which National Century purchased accounts receivable and raised capital by issuing investment-grade notes. See In re Nat'l Century Fin. Enterprises, 2011 WL 1397813, at *1. National Premier Financial Services, Inc. – another wholly-owned subsidiary formed in Ohio – performed the role of "Servicer." It made purchasing decisions on behalf of NPF VI and NPF XII, monitored and collected payments on purchased receivables, kept records, and maintained reserve accounts for NPF VI and NPF XII. Id.

As they did with National Century, Lance Poulsen and Ayers occupied officer and director positions of NPF VI, NPF XII, and the Servicer. Poulsen was the president, treasurer, and director of NPF VI and NPF XII, while Ayers and Rebecca Parrett[1] held the positions of chairman, vice president, secretary and director. Id. at *2. Poulsen also served as president, treasurer, and sole director of the Servicer, while Ayers served as a vice president. Id.

Lance Poulsen and the other Principals used their power over National Century and its supposedly independent subsidiaries to defraud investors. National Century represented that its

---

[1]Another of National Century's original founders, Rebecca Parrett, is not a party in this litigation. The district court found her guilty of multiple counts of securities fraud, wire fraud, and conspiracy to commit securities fraud. See U.S. v. Poulsen, No. 2:06-cr-129 (S.D. Ohio) at doc. 531. She fled the country after her conviction and has been barred by the fugitive disentitlement doctrine from making any further claims in this litigation. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., No. 2:03-md-1565, 2008 WL 4059789, at *1 (S.D. Ohio Aug. 26, 2008). Parrett eventually was brought back into custody and is serving a sentence of 25 years in prison.

6

investment-grade notes issued through NPF VI and NPF XII were secured by healthcare receivables obtained in its regular course of business.  The Master Indentures governing the NPF note programs required NPF VI and NPF XII to purchase "eligible" receivables, those that satisfied certain criteria designed to ensure that the receivables were of high quality.  Id.  National Century presented its bonds as being backed by the pool of receivables, meaning they were "asset-backed securities."  The company also marketed its bonds as "over-collateralized," meaning the value of the receivables exceeded the value of the bonds.  Poulsen, 568 F. Supp. 2d at 893.  This all led to National Century's AAA credit rating, which it touted to potential investors as a sign of the company's strength.  Id.

In reality, a great deal of the accounts receivable that NPF VI and NPF XII "purchased" were worthless or non-existent.  And what appeared on paper to be legitimate transactions were not so in fact.  Many of the advances of funds went to healthcare companies in which Poulsen and Ayers held undisclosed ownership interests.  Testimony given in the criminal proceedings against the Principals provided a telling snapshot of the fraud: National Century made $1.3 billion in unsecured advances during a four-year window to eight healthcare providers.  Ayers and Poulsen held an ownership stake in seven of them.  See id. at 900.  By the time National Century went bankrupt in November 2002, investors suffered losses of nearly $3 billion.  In re Nat'l Century Fin. Enterprises, Inc., 2011 WL 1397813, at *2.

It is undisputed that Poulsen, Ayers, Faulkenberry, and Dierker used their authority at National Century to commit a multi-billion dollar fraud.  See, e.g., Faulkenberry, 614 F.3d at 577-79 (6th Cir. 2010); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 617 F. Supp. 2d 700, 705-07 (S.D. Ohio 2009); Poulsen, 568 F. Supp. 2d at 890-912; In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., No. 2:03-md-1565, 2006 WL 469468, at **1-6 (S.D. Ohio Feb. 27, 2006); In re Nat'l Century Fin. Enterprises, Inc., 341 B.R. 198, 209-10 (Bankr. S.D. Ohio 2006).  All of the Principals have been convicted of crimes relating to their roles in the fraudulent scheme.  The court provides more details

7

of their convictions below.

**B.     The D&O Policies**

Before its collapse, National Century purchased two separate D&O insurance policies on March 28, 2002.  The primary policy was issued by Gulf Insurance Company and provided $5 million of coverage.  National Century purchased an excess policy from Great American for an additional $5 million of coverage, effective upon exhaustion of the Gulf policy.  The insureds under both policies were National Century and its directors and officers.  Although the policy period ran to March 28, 2003, National Century exercised an option for tail coverage under both policies, giving it an additional one-year discovery period for bringing claims that arose during the original policy period.

Both the Gulf policy and the Great American policy are important in this case.  Great American's policy was a "follow form" to Gulf's, meaning that it "conform[ed] to the exact terms, conditions, insureds and additional insureds" of the Gulf policy unless stated otherwise.  Great American Excess Policy, p.1.  As a bit of background, the Gulf policy generally provides coverage for any loss incurred by an insured as a result of a claim made against the insured for a wrongful act.  See Gulf Policy, §1.  A loss includes amounts the insured is legally obligated to pay as a result of all claims made against the insured, including defense costs incurred in defending or investigating a claim. See id., §2.Q.  Wrongful acts include "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted, or allegedly committed or attempted, by one or more Director or Officer . . . ."  Id., §2.HH.

Several additional clauses from both policies are noteworthy up front.  The Gulf policy protects the insurer from liability in claims where the insured committed a fraudulent or dishonest act.  See id., §4.I.1.  Further, it provides that where a statement or misrepresentation in the insurance application is untrue, the policy is "void and of no effect" with respect to those who knew of the facts that were not truthfully disclosed.  See id., §20.B.

8

As for Great American's policy, its Excess Follow Form Policy states that it conforms to the terms and conditions of the primary Gulf policy, "except with respect to the Limit of Liability, Policy Period, premium, endorsements attached hereto and terms as set forth below." Great American Excess Policy, p.1. The declarations page to the policy states that the proposal form is part of the insurance contract, and the proposal form states the same. Poulsen filled out the proposal form on March 7, 2002 in order to acquire Great American's coverage. The proposal form notes that "material facts or circumstances known to the person who subscribed this Proposal Form" – Poulsen, in this instance – may be imputed to other insureds for "purposes of determining the validity" of the policy. Great American Proposal Form, p.4. The proposal form expressly incorporates certain documents submitted with the proposal, including National Century's three most recent annual audited financial statements and its latest interim financial statement.

## C.  Procedural History

### 1.  Prior Proceedings

On November 18, 2002, National Century filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. National Century's investors soon filed numerous civil actions against Poulsen and Ayers, the Outside Directors, and against other persons and entities involved in the company's operations. The Judicial Panel on Multidistrict Litigation consolidated those actions before this court in November 2003. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 2:03-md-1565 (S.D. Ohio).

The debtors originally filed this action as an adversary proceeding against Gulf, Great American, and the other potential insureds under the two D&O policies. The complaint sought a declaration that the policies were enforceable and requested an equitable procedure for apportioning the proceeds among the insureds. The UAT later was substituted as the plaintiff when the bankruptcy court's

liquidation plan authorized the UAT to pursue certain legal causes of action that belonged to the debtors.  The UAT exists for the benefit of National Century's many creditors.

Gulf filed a motion to deposit the policy limit and obtain a discharge of liability.  The bankruptcy court granted this motion, and Gulf deposited $5 million into an escrow account.  The bankruptcy court then held a hearing to determine covered losses under the Gulf policy and how to allocate the proceeds.  Aside from the UAT, seven individuals asserted a right to the proceeds: Lance Poulsen, Barbara Poulsen, Donald Ayers, Rebecca Parrett, Thomas Mendell, Harold Pote, and Eric Wilkinson. The court issued an opinion and order on January 10, 2005 finding that the UAT and the seven individuals had all incurred covered losses.  The court ordered that UAT receive $1.5 million and that each of the seven individuals receive $500,000.  None of the parties appealed the bankruptcy court's decision.

Meanwhile, Great American asserted counterclaims seeking rescission of its policy and declaratory judgment that the policy was void for fraud.  The UAT filed a motion to dismiss the counterclaim.  Donald Ayers also filed a motion for advancement of defense costs.  The bankruptcy court severed all claims, cross-claims, counterclaims, and defenses relating to the Great American policy so that the court could move forward with the Gulf policy dispute.  Great American moved to withdraw the reference of the excess D&O policy dispute.  This court granted the motion to withdraw on July 5, 2005.

Ayers re-filed his motion to advance defense costs pursuant to the Great American policy on January 27, 2006.  The matter was then stayed for a time pending mediation. Attempts at mediation were unsuccessful.  Soon thereafter, Lance Poulsen and Barbara Poulsen, as well as Dierker joined in the motion to advance defense costs.  The Outside Directors filed a notice stating that they took no position on whether Great American should be required to advance defense costs.

10

On July 10, 2007 this court denied the motion filed by Ayers for the advancement of defense costs.  The court found that his claim suffered from many defects, not the least of which was that he had failed to prove that he had exhausted his proceeds from the Gulf policy.

### 2.    Related Criminal Cases

The government successfully pursued criminal charges against each of the Principals.  The evidence from trial against the Principals, and against Lance Poulsen in particular, was "substantial."  U.S. v. Poulsen, No. 2:06-cr-129, 2009 WL 1604975, at *3 (S.D. Ohio June 8, 2009).  The trial records and testimony show that National Century's fraud stretched back at least to 1995, id. at *10, and that the company was in dire financial straits as early as 1999, id. at *13.  Finding and working with investors was central to National Century's fraudulent scheme.  In order to attract investors despite the fraud and despite the company's depleted financial reserves, company employees went to "extraordinary lengths to conceal what it was really doing."  Id. at *8.

The trial records provide an in-depth account of how exactly National Century went about deceiving investors and auditors.  At Poulsen's direction, the company's Compliance Department prepared regular investment reports, but with one catch.  The data in the reports was entirely fabricated.  Id. at *10.  From 1995 onward, "every single" NPF VI investor report "contained false and fabricated data."  Id.  "The same was true for every single investor report issued for NPF XII, which opened in 1999."  Id.

National Century's dealings with auditors were just as deceitful.  National Century "create[d] all the [fabricated] backup data that went into producing the investor reports" so that it would "match the false data shown in the investor reports."  Poulsen, 568 F. Supp. 2d at 897.  The auditors also checked National City's financial records to ensure that the company had enough collateral behind its advances, but the company avoided the auditors' notice by "inputting ineligible and non-existent collateral into

11

the Servicer Department's computer tracking system to make it appear as though" an appropriate amount of collateral was in place.  Id.

Based on each of their roles in the fraud, Poulsen, Ayers, Dierker, and Faulkenberry have all been convicted in criminal proceedings.  Poulsen was convicted of securities fraud, wire fraud, conspiracy to commit those crimes, money-laundering conspiracy, and concealment of money laundering.  Poulsen, 2009 WL 1604975, at *2.  Poulsen's convictions and 30-year sentence have been affirmed on appeal by the Sixth Circuit.  U.S. v. Poulsen, Nos. 08-4218, 09-3658 (6th Cir. Aug. 25, 2011).

Ayers appealed after a jury convicted him of securities fraud, conspiracy to commit securities and wire fraud, and conspiracy to commit money laundering.  The Sixth Circuit reversed his money-laundering conviction and affirmed his fraud convictions.  On December 22, 2010, the district court sentenced Ayers to 15 years incarceration.  U.S. v. Ayers, 759 F. Supp. 2d 945, 957-58 (S.D. Ohio 2010).  Ayers has appealed his amended sentence.  U.S. v. Ayers, No. 10-4617 (6th Cir.).

Faulkenberry likewise was convicted of securities fraud, wire fraud, money laundering, and conspiracies to commit those crimes.  The Court of Appeals reversed his money-laundering convictions and affirmed his fraud convictions.  On November 29, 2010 the district court re-sentenced him to ten years incarceration.  U.S. v. Faulkenberry, 759 F. Supp. 2d 915, 919 (S.D. Ohio 2010).  He too has appealed his amended sentence.  U.S. v. Faulkenberry, No. 10-4362 (6th Cir.).

Dierker's case tracks a similar path.  He was convicted of conspiracy to commit securities and wire fraud, conspiracy to commit money laundering, and concealment money laundering.  He appealed, and the Sixth Circuit reversed his money-laundering convictions and affirmed his other convictions.  U.S. v. Dierker, 417 Fed. App'x 515, 525 (6th Cir. 2011).  Dierker now awaits re-sentencing.

### 3.    Motions *Sub Judice*

#### a.    The Principals' Motions for Summary Judgment

Ayers has filed a motion for partial summary judgment to require Great American to pay his defense costs.  Poulsen and Dierker moved to join Ayers' motion, and Faulkenberry has intervened to file his own motion for summary judgment to require Great American to pay defense costs to him. Despite multiple motions, the parties' theories are generally consistent.  They argue that they are insured parties according to the language of the contract; that their litigation defenses have cost them a substantial amount of money; and that the Gulf policy has been exhausted, triggering Great American's duty to pay.

Both the UAT and Great American oppose these motions.  The UAT believes that the Principals have failed to address the effect of entity coverage under the insurance policy.  The UAT argues that as a matter of equity, any payment under the policy should be given to it and not to anyone else.  The UAT further asserts that the Principals have failed to prove that they exhausted the $500,000 awarded to each of them from the Gulf policy (only Poulsen and Ayers received money from the Gulf policy), and request a hearing on the matter.

Great American argues that it rescinded the contract.  The insurance contract is void *ab initio*, Great American argues, based on Poulsen's fraudulent conduct in procuring the policy.

#### b.    Great American's Motions for Summary Judgment

After more information emerged from the criminal proceedings about National Century's business failings, Great American filed two of its own motions for summary judgment: one moving that Ayers, Faulkenberry, and Dierker are not entitled to insurance coverage, and one that Lance Poulsen and all other potential claimants are not entitled to insurance coverage.

In its first motion, Great American argues that the convictions of Ayers, Faulkenberry, and Dierker trigger the dishonesty exclusion found in the Gulf insurance policy.  See Gulf Policy §4.I.  The dishonesty exclusion, Great American argues, is included in its policy because it follows form to Gulf's policy.  The three Principals named in the motion attempt to counter by arguing that their criminal convictions are not "final" and thus could not be used to exclude them from coverage.

Great American's second motion for summary judgment likewise argues that Lance Poulsen is excluded from coverage under the dishonesty exclusion.  Great American also argues that Lance Poulsen's conduct bars everyone else from coverage because he committed fraud in the procurement of the policy, thus rendering it void *ab initio*.  The UAT and Outside Directors counter that the Great American policy contained no provision allowing Great American to rescind the policy as void *ab initio*. They further argue that Great American waived its right to rescind when it accepted the premium payment for tail coverage.  They also argue that to the extent the dishonesty exclusion has been triggered, the adverse interest exception to agency law protects their right to coverage, such that the Principals' fraud should not be imputed to them.

The matter is now before the court on the above competing motions for summary judgment.

## III.    Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper  "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  See Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009).  The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).  This may be

accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial.  Id.

Further, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465.  "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment."  Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).  Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).  Even so, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."  Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

IV.    **Discussion**

   A.    **Ohio Law Applies**

   As an initial matter, all parties agree that Ohio law applies to the current contract dispute, and

the court agrees.  "It is well-settled in Ohio that in cases involving a contract, the law of the state where

the contract is made governs interpretation of the contract."  <u>Nationwide Mut. Ins. Co. v. Ferrin</u>, 21

Ohio St.3d 43, 44, 487 N.E.2d 568, 569 (Ohio 1986) (citing cases).  Absent a choice of law provision

in the contract, a court may look at the following factors in determining where the contract was made:

the place of contracting; the place of negotiations of the contract; the place of performance; the location

of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation and

place of business of the parties.  <u>Gries Sports Enterprises, Inc. v. Modell</u>, 15 Ohio St.3d 284, 287, 473

N.E.2d 807, 810 (Ohio 1984).

   In this case, the balance points to Ohio.  At the time National Century and Great American

signed and executed the insurance contract, their respective principal places of business were in Ohio.

Further, the subject matter of the contract concerns actions in Ohio, and the parties negotiated and

signed the contract in Ohio.  Because the parties do not argue otherwise and because the information

before the court confirms what the parties agree upon, Ohio law applies to resolving this contract

dispute.

   B.    **Rescission**

      1.    **Void *Ab Initio***

   Great American argues that is entitled to rescind the excess policy as void *ab initio* because

Poulsen's false representations in the policy proposal form render the policy null and void.  If Great

American is correct, this would have a broad sweep, excluding all insureds from coverage, not just those

(the Principals and the UAT) denied coverage by the dishonesty exclusion, as discussed in Part IV.C

below. The UAT and the Principals, as well as the Outside Directors and Barbara Poulsen, oppose Great American's rescission argument.

As a threshold matter, the court has little difficulty in concluding that Poulsen made misrepresentations of material fact in the proposal form. See Cross v. Ledford, 161 Ohio St. 469, 475, 120 N.E.2d 118, 122 (Ohio 1954) (setting forth elements of rescission). The proposal form specifically required and incorporated the company's three most recent annual financial statements and its latest interim financial statement. See Great American Proposal Form, p. 4 (stating that the required documents were "considered part of the Proposal Form"). Great American correctly asserts that Poulsen misrepresented National Century's solvency and various matters covered in National Century's financial statements. Only Poulsen and Ayers attempt to argue that the financial documents were not actually fraudulent. This argument must be rejected. The facts proved in the criminal proceedings and in the multidistrict litigation have thoroughly established that those documents were false. Indeed, the data upon which the statements were based was entirely fabricated, and Poulsen knew this; he was the one who ordered that the data be falsified. See, e.g., Poulsen, 568 F. Supp. 2d at 894-99; Poulsen, 2009 WL 1604975, at **10-11; In re Nat'l Century Fin. Enterprises, 2011 WL 1397813, at **1-3.

Further, it is uncontroverted that Poulsen's representations about National Century's financial condition were material to, and reasonably relied upon by, Great American in deciding whether to issue the policy. See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Sahlen, 999 F.2d 1532, 1536 (11th Cir. 1993) (holding that financial documents "specifically required as part of the application" "were patently critical to the insurer's decision to provide [D&O] coverage"); Jaunich II v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., 647 F.Supp. 209, 211 (N.D. Cal. 1986) (noting that "the financial health of a company as well as the existence of circumstances that can lead to litigation are material to an insurer's decision to issue a Directors and Officers' liability policy," especially where such "information has been specifically requested as part of the insurance application" and the information "was only available to

17

the company or parties closely connected to the company").

Now to the effect of Poulsen's misrepresentations. Whether or not a policy's language allows

the contract to be voided *ab initio* depends on what is known in Ohio as the <u>Boggs</u> test.

> Statements by an insured fall into two classes – those which constitute warranties, and those which constitute representations.

> The consequences of a misstatement of fact by an insured are entirely different, depending on whether the statement is a warranty or a representation. If the statement is a warranty, a misstatement of fact voids the policy *ab initio*. However, if the statement is a representation, a misstatement by the insured will render the policy voidable, if it is fraudulently made and the fact is material to the risk, but it does not void the policy *ab initio*.

> In the law of insurance, a representation is a statement made prior to the issuance of the policy which tends to cause the insurer to assume the risk. A warranty is a statement, description or undertaking by the insured of a material fact either appearing on the face of the policy or in another instrument specifically incorporated in the policy. <u>Hartford Protection Ins. Co. v. Harmer</u> (1853), 2 Ohio St. 452. <u>See</u> 30 Ohio Jurisprudence 2d 415, Section 460.

> The insurer's decision to incorporate the statement in or to omit it from the policy generally controls whether the statement is a warranty or a representation.

<u>Allstate Ins. Co. v. Boggs</u>, 27 Ohio St.2d 216, 218-219, 271 N.E.2d 855, 858 (Ohio 1971). <u>See also</u> <u>State</u>

<u>Farm Fire & Cas. Co. v. Davidson</u>, 87 Ohio App.3d 101, 104, 621 N.E.2d 887, 889 (Ohio Ct. App.

1993).

To put the <u>Boggs</u> test in context, the proposal form signed by Poulsen included material

misrepresentations about various aspects of National Century's financial condition. Under <u>Boggs</u>,

Poulsen's misrepresentations fall into one of two categories: "those which constitute warranties, and

those which constitute representations." <u>Id.</u> at 218, 271 N.E.2d at 858. Should they be classified as

"warrant[ies], a misstatement of fact voids the policy *ab initio*" and no insured is entitled to coverage.

<u>Id.</u> On the other hand, if Poulsen's statements are just "representation[s], a misstatement by the insured

will render the policy voidable." <u>Id.</u> at 219, 271 N.E.2d at 858. This would mean that coverage would

18

still be available to the insureds for liability arising before the insurer cancels the policy, subject of course to other conditions of the policy, such as the dishonesty exclusion.

In order to render the policy void *ab initio*, Poulsen's statements must satisfy two criteria.  First, they must "either appear[] on the face of the policy or in another instrument specifically incorporated into the policy."  Boggs, 27 Ohio St.2d at 219, 271 N.E.2d at 858.  And second, the terms of the policy must "clearly and unambiguously" "provide that a misstatement by the insured shall render the policy void *ab initio*."  Id.

Under the first part of the test, the question is whether the statement at issue appears "on the face of the policy or in another instrument specifically incorporated in the policy."  Id.  "In order to have an incorporation by reference in an insurance policy, it must be done in unequivocal language on the face of the policy."  Id. at 220, 271 N.E.2d at 859.  The UAT and Outside Directors argue that the following statement in the excess policy fails to specifically incorporate the proposal form:

> In consideration of the payment of premium, and in reliance upon the information furnished to the Great American Insurance Company . . . it is hereby understood and agreed that this excess policy will conform to the exact terms, conditions, endorsements, Insureds and additional Insureds of the Primacy Policy at its inception, except with respect to the Limit of Liability, Policy Period, premium, endorsements attached hereto and terms as set forth below.

Great American Excess Policy, p. 1.  In short, the UAT and the Outside Directors contend that this language does not unequivocally incorporate the proposal form and its attached financial statements.

The court would agree that this clause alone is insufficient to incorporate the proposal form, but the declarations page does unambiguously incorporate the proposal form.  The declarations page provides, "These Declarations, along with the endorsements (if any) and the completed and signed Proposal Form shall constitute the contract between the Insured and Insurer."  Great American Declarations, p. 2.  The declarations thus specifically incorporate the proposal form, which in turn specifically incorporates the financial statements.  And to take one step back, the excess policy expressly

19

refers to the declarations in defining coverage.  <u>See</u> Great American Excess Policy, §§ II.A, VI.A, VI.D. Moreover, Ohio courts follow the well-accepted rule that the declarations to an insurance contract are considered part of the policy.  <u>See</u> <u>Davidson</u>, 87 Ohio App.3d at 104, 621 N.E.2d at 889 (holding that first part of <u>Boggs</u> test was satisfied where purported warranty language appeared in the declarations to the policy); <u>Hannenmann v. State Farm Ins. Companies</u>, No. 1:07-cv-2712, 2008 WL 2080731, at *6 (N.D. Ohio May 16, 2008) (interpreting insurance contract in light of declarations to the policy).  <u>See</u> <u>also</u> 16 Williston on Contracts § 49:25 (4th ed. 1990) ("The contents of a declarations sheet, or the declarations page, of an insurance policy is regarded as part of the insurance contract.  The declarations page is the one page of the policy likely to be read by the insured, and contains the terms most likely to have been requested by the insured; it therefore is held to define the coverage afforded the insured and to control over more restrictive terms contained in the body of the policy.") (footnotes omitted).

If this were not enough, the excess policy follows form to the primary Gulf policy, which specifically states that the application form is incorporated into the terms of the policy.  <u>See</u> Gulf Policy, p. 1.  The proposal form itself confirms the parties' intent that it be part of the policy.  It provides, "It is agreed by the Company and the Insured Persons that the particulars and statements contained in the Proposal Form and any information provided herewith . . . are the basis of this Policy and are to be considered as incorporated in and constituting a part of this Policy."  Great American Proposal Form, p. 4.  Ohio case law holds that language of this sort shows "unambiguously" that applications and any attached forms are incorporated into the actual policy.  <u>See</u> <u>Winston v. Illinois Nat'l Ins. Co.</u>, No. C-000251, 2001 WL 395154, at *3 (Ohio Ct. App. Apr. 20, 2001) (holding that the first prong of the <u>Boggs</u> test is satisfied when, as here, the policy includes an application that contains unambiguous language linking back to the policy); <u>Personal Serv. Ins. Co. v. Lester</u>, No. 06CA12, 2006 WL 2796253, at *5 (Ohio Ct. App. Sept. 25, 2006) (same; adding that, where the policy form includes attached documents, such as an application, "any representations made on the application become part of the policy").

The second prong of the Boggs test requires that the terms of the policy "clearly and unambiguously" "provide that a misstatement by the insured shall render the policy void *ab initio*." Boggs, 27 Ohio St.2d at 219, 271 N.E.2d at 858.  This means that the policy needs to contain a provision "to the effect that any misstatement or misrepresentation made by the insured shall render the policy void."  Id.

Here, the Gulf policy – again to whose "exact terms" the excess policy followed form – states that "In the event that any statement or representation in the Application is untrue, this Policy shall be *void and of no effect whatsoever* . . . ."  Gulf Policy, §20.B (emphasis added).  The court finds as a matter of law that this language unambiguously indicates that "any misstatement or misrepresentation made by the insured shall render the policy void."  Boggs, 27 Ohio St.2d at 219, 271 N.E.2d at 858.  Ohio courts hold that the second prong of Boggs is satisfied by language cautioning that a misrepresentation will render the policy "void," or "null and void," or "null and without effect."  See Medical Protective Co. v. Fragatos, 190 Ohio App.3d 114, 122, 940 N.E.2d 1011, 1017 (Ohio Ct. App. 2010); CNH Capital v. Janson Excavating, Inc., 171 Ohio App.3d 694, 700, 872 N.E.2d 980, 985 (Ohio Ct. App. 2007); Personal Serv. Ins., 2006 WL 2796253, at *5; Horton v. Safe Auto Ins. Co., No. 00AP-1017, 2001 WL 664421, at *3 (Ohio Ct. App. June 14, 2001); Winston, 2001 WL 395154, at *3; McGuire v. Erie Ins. Exchange, No. 92-CA-5, 1992 WL 518771, at *2 (Ohio Ct. App. Dec. 11, 1992); but see American Family Ins Co. v. Johnson, No. 93022, 2010 WL 1712240, at *4 (Ohio Ct. App. April 29, 2010) (holding that the word "void" is not sufficient).

The UAT argues, however, that the excess policy has its own provision concerning the effect of a misrepresentation.  An endorsement to the excess policy provides that the insurer may cancel the policy for numerous reasons, including "discovery of fraud or material misrepresentation in the procurement of this insurance or with respect to any claims submitted hereunder."  Ohio Excess Amendatory Endorsement, § B(1)(b).  If this cancellation clause conflicts with the rescission clause in

21

the primary policy, then the terms of the excess policy must control.  See Griewahn v. United States Fid. & Guar. Co., 160 Ohio App. 3d 311, 319, 827 N.E.2d 341, 347 (Ohio Ct. App. 2005) ("To the extent the language of a primary policy and a following form excess policy differ, the terms of the excess policy control where the excess coverage is implicated").

The court finds that the two clauses provide alternative, not conflicting, remedies to the insurer. Though Boggs sets a higher standard for when a policy may be rescinded as void *ab initio*, there is no apparent reason why an insurer could not have both cancellation and rescission available as remedies if the policy so provides.  Cf. Ozbay v. Progressive Ins., No. WD-02-007, 2003 WL 257448, at *6 (Ohio Ct. App. Feb. 7, 2003) (finding that the policy provided the insurer with several remedies in the event of a misrepresentation, including the right to void the policy *ab initio*); Burton v. Wolverine Mut. Ins. Co., 213 Mich. App. 514, 517, 540 N.W.2d 480, 481 (Mich. Ct. App. 1995) (finding that the policy gave insurer both the right to rescind as void *ab initio* and to cancel; once insurer elected its remedy to cancel, it waived the right to rescind).  In other words, the policy here does not say that when the insurer discovers a fraud in the procurement of the policy, its only available remedy is to cancel the policy. When the cancellation clause is read together with the primary policy's rescission clause, Great American may either cancel or rescind as void *ab initio* when it discovers a fraud by Poulsen in the procurement of insurance.  See Prudential Ins. Co. of Am. v. Corporate Circle, Ltd., 103 Ohio App.3d 93, 98, 658 N.E.2d 1066, 1069 (Ohio Ct. App. 1995) (all writings that are part of the same transaction must interpreted together and in a manner as to give effect to every provision) (citing Ohio cases).

The UAT and the Outside Directors next argue that the severability language of the Gulf policy protects innocent insureds from Poulsen's actions.  The language states that the contract is void for a misrepresentation in the application "only with respect to any Insured Person who had knowledge or information as of the Policy Inception Date of the facts that were not truthfully disclosed."  Gulf Policy, §20.B.1.  And because the summary judgment record establishes for now that only Poulsen and the

Principals knew of the misrepresentations, so the argument goes, the contract is not void as to other potential claimants.

This would be the case were it not for a clause in the Great American proposal form that provides to the contrary. The excess policy follows form to the primary policy except where the terms of the excess policy state otherwise. The Great American proposal form contains a clause modifying the Gulf Policy's severability language:

> "[E]xcept for material facts or circumstances known to the person who subscribed this Proposal Form, any misstatement or omission in this Proposal From or information provided herewith in respect of a specific Wrongful Act by a particular Director or Officer or his or her cognizance of any matter which he or she has reason to believe might afford grounds for a future Claim against him or her shall not be imputed to any other Director or Officer for purposes of determining the validity of this Policy as to such other Director or Officer."

Great American Proposal Form, p. 4. This language thus provides that material facts or circumstances known by Poulsen when he signed the form will be imputed to other insureds "for purposes of determining the validity" of the policy.

Other courts interpreting the exact same contractual language agree that it is unambiguous and imputes the signor's knowledge of material facts or circumstances to other directors and officers. See Travelers Indem. Co. v. Bally Total Fitness Holding Corp., 448 F. Supp. 2d 976, 983 (N.D. Ill. 2006); Great Am. Ins. Co. v. Gross, No. 3:05CV159, 2008 WL 376263, at *14 (E.D. Va. 2008) ("Thus, because the policy provision imputes the misrepresentation of material facts and circumstances to innocent insureds, the Court concludes that the rescission of the policy is equally applicable to an innocent insured."). As the court in Cutter & Buck, Inc. v. Genesis Ins. Co. explained with respect a severability clause similar to the one here:

> That clause indicates that a director's or officer's knowledge of a misrepresentation made with an intent to deceive is not imputed to other directors or officers unless the application's signor knew of the misrepresentation. This clearly implies that when the signor knows that there are misrepresentations in the application materials, that knowledge is imputed to all other directors or officers. The result is that innocent

23

directors or officers retain coverage unless the application's signor knows of a misrepresentation within the application, in which case even innocent directors and officers lose coverage.

306 F. Supp. 2d 988, 1012 (W.D. Wash. 2004).

Poulsen's fraudulent conduct and material misstatements are not in controversy. He knew beyond doubt that the financial statements he submitted were false. Indeed, Poulsen had his own "Lance Copy" financial reports, which contained the true numbers revealing National Century's dire financial straits and fraudulent business model. See Poulsen, 2009 WL 1604975, at **13-14. Under the terms of the severability clause, Poulsen's misrepresentations are imputed to the other insureds for purposes of determining the validity of the policy. And the policy is "void and of no effect whatsoever" when, as here, the signor makes material misrepresentations in the proposal form.

## 2.    Waiver of the Right to Rescind

The UAT contends that Great American waived its right to rescission when it accepted a premium payment for tail coverage. The Gulf and Great American policies expired on March 28, 2003. The Gulf policy provided National Century with the option of purchasing tail coverage, which gave the company an additional one-year discovery period to make claims for wrongful acts that occurred within the original policy period. See Gulf Policy, Endorsement No. 2. As a follow form policy, the Great American policy also offered tail coverage. On March 28, 2003, the debtors (by this time National Century had filed for bankruptcy) purchased tail coverage from Gulf. Id., Endorsement No. 8. The debtors also purchased tail coverage from Great American on March 28, 2003 and tendered payment of $64,750, which Great American accepted. See Great American Excess Policy, Endorsement No. 3.

On June 6, 2003, the debtors filed an adversary proceeding against Gulf and Great American for coverage under the D&O policies. Gulf deposited $5 million with the bankruptcy court for the court to apportion the proceeds among the insureds. Great American answered and filed counterclaims for rescission and declaratory relief on October 1, 2003. It notified the debtors of its election to rescind

24

and tendered the return of premiums to the debtors on October 10, 2003. See Great American Mot.

for Summ. J. (Doc. 96), Ex. F.

The UAT's argument that Great American waived its right to rescind the policy relies on the

following Ohio Supreme Court decision:

> A party to a contract who, after discovery or knowledge of facts which would entitle
> him to rescind, treats the contract as a subsisting obligation and leads the other party to
> believe the contract is still in effect, waives his right to rescind. . . .  Therefore, the
> receipt and retention of consideration after knowledge that conditions precedent have
> been broken, constitutes a waiver of such conditions so as to withdraw them from the
> terms of the contract.
>
> . . .
>
> It is also a well settled rule of law that an insurer, which, with knowledge of the facts
> which would entitle it to treat the policy as no longer in force, receives and accepts a
> premium on a policy, is estopped to take advantage of the forfeiture.  The insurer
> cannot treat the policy as void for the purpose of defense to an action to recover for a
> loss thereafter accruing, and at the same time treat it as valid for the purpose of earning
> and collecting further premiums.

English v. National Cas. Co., 138 Ohio St. 166, 169, 171, 34 N.E.2d 31, 33-34 (Ohio 1941).

The UAT contends that by March 28, 2003 Great American either knew or should have known

that the financial statements Poulsen submitted with the proposal form were false.  National Century

filed for bankruptcy on November 18, 2002, and the debtors' January 2003 schedules of assets and

liabilities filed in the bankruptcy proceedings laid bare that National Century's prepetition financial

statements were false.  See In re Nat'l Century Fin. Enterprises, Inc., Case No. 2:02-bk-65235 (Bankr.

S.D. Ohio) (Doc. Nos. 600, 601, 606-07, 612-13).  Further, financial news publications at the time

reported that National Century was found to have falsely reported its financial condition.  See UAT

Response, Ex. A (collection of national media reports).  Indeed, the corporate-restructuring specialist

who was appointed as National Century's postpetition chief executive was reported in the Wall Street

Journal on January 24, 2003 as saying that he had never "had experience with a falsification of

information . . . that compares to this."  Id., at p. 2 (also noting the "gaping hole" in funds that were

25

supposed to underpin National Century's bonds).

The court agrees that there is a genuine issue of material fact concerning whether Great American waived its right to rescission by accepting payment for tail coverage. There is a triable issue as to what Great American knew about National Century's bankruptcy and the reports of the company's falsification of financial records when the debtors purchased tail coverage. At the summary judgment stage, Great American did not submit any evidence suggesting that its agents knew nothing of National Century's collapse and alleged falsification of records.

If Great American knew at the time it accepted payment for tail coverage that Poulsen had submitted false financial statements in the proposal form, then it was fully aware of its grounds for rescinding the policy as void *ab initio*. Under English, a party to an insurance contract waives its right to rescission if it "receives and accepts a premium on a policy" when it has "knowledge of the facts which would entitle it to treat the policy as no longer in force." English, 138 Ohio St. at 171, 34 N.E.2d at 34.

In English, the insured sought to renew his automobile insurance. His original policy application disclosed that he had turned 65 years old by the time he sought to renew. Even though the insurance policy stated that individuals over the age of 65 years would not be covered, the insurer accepted the insured's premium and issued him a receipt of renewal coverage. When the insured suffered a loss during the renewal period, the insurer attempted to rescind on the basis of the insured's age. The Ohio Supreme Court held that the insurer had waived its right to rescind coverage for a loss during the renewal period because it had accepted the premium despite knowing of the insured's age. A critical factor in the court's reasoning was that the insurer had elected to treat the policy as "a subsisting obligation" and led the insured "to believe the contract was still in effect. English, 138 Ohio St. at 169, 34 N.E.2d at 33. The court found that it would be inequitable to allow the insurer to rescind after it had "'deceived the insured into thinking he [was] insured.'" Id., 138 Ohio St. at 171, 34 N.E.2d

26

at 33 (quoting 29 Am. Jur. 611, §807).

Great American puts much emphasis on the fact that the purchase of tail coverage is not a renewal of coverage, as in English, but merely an extension of the time for the insured to file a claim. The court finds this argument unpersuasive. If Great American knew of its grounds for voiding the policy when the debtors tendered payment for tail coverage, then the act of accepting payment was inconsistent with Great American's position that the policy was void *ab initio*. From that position's point of view, there was no tail coverage to be purchased because the policy was void from its inception, as if it never existed. Accepting payment signaled to the debtors that the tail coverage was in effect, or, as the English court put it, a "subsisting obligation." See also Automated Solutions Corp. v. Paragon Data Sys., Inc., 167 Ohio App.3d 685, 695, 856 N.E.2d 1008, 1016 (Ohio Ct. App. 2006) (a party can waive a contractual right by a "clear, unequivocal, decisive act"). If Great American in fact knew of Poulsen's deception, then it cannot treat the tail coverage as in effect for purposes of earning the premium yet later take the legal position that the policy never existed to begin with.

Accordingly, the court finds that Great American is not entitled to summary judgment on the grounds that the policy is void *ab initio* because there remains a genuine issue of material fact concerning whether Great American waived its right to rescission.

### C.     The Dishonesty Exclusion

#### 1.     Applied to the Principals

Great American argues in the alternative in its motions for summary judgment that the Gulf policy's dishonesty exclusion prevents Poulsen, Ayers, Dierker, and Faulkenberry from coverage eligibility. The central argument is not complex. The Great American policy follows form to the Gulf policy, which contains a dishonesty exclusion for criminal conduct. See Gulf Policy, §4.I.1. This means that Great American's policy contains the dishonesty exclusion. Great American argues that the criminal convictions of the Principals triggers the dishonesty exclusion and excludes them from

27

coverage.

The court agrees and finds as a matter of law that the plain language of the dishonesty exclusion is satisfied. See Saunders v. Mortensen, 101 Ohio St. 3d 86, 88, 801 N.E.2d 452, 454 (Ohio 2004) (court must look first to the plain language of the contract.).  The exclusion reads, "The insurer shall not be liable to make any payment for Loss in connection with any Claim . . . against any Insured" that is:

> brought about or contributed to by any deliberately fraudulent or deliberately dishonest act or omission or any purposeful violation of any statue or regulation by such Insured if a judgment or other final adjudication adverse to such Insured establishes such a deliberately fraudulent or deliberately dishonest act, omission, or purposeful violation.

Gulf Policy, §4.I.1.  The language is clear.  If a "judgment or other final adjudication" establishes that the insured party committed a "deliberately fraudulent or dishonest act," then he will not receive coverage for any claim brought about by his fraudulent or dishonest act.

Applied to the current facts, the policy language describes the Principals' wrongdoing exactly, and none of them argue otherwise.  Putting aside the money laundering charges that were reversed on appeal, the Principals were convicted of crimes having fraudulent conduct as an element of the offense, namely securities fraud, wire fraud, and conspiracy to commit securities and wire fraud.  See 15 U.S.C. §§ 77q(a) and 77x (securities fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 371 (conspiracy).  The jury specifically found that these violations were knowing and willful.  See U.S. v. Poulsen, No. 2:06-cr-129 (S.D. Ohio) (jury verdicts, docs. 531, 857).

Further, there is no dispute that the defense costs for which the Principals seek coverage directly relate to claims against them that were brought about by their deliberately fraudulent and dishonest conduct.  First, each of the Principals seek defense costs expended in their criminal cases, and the policy plainly relieves Great American from liability for such losses.  Second, Poulsen and Ayers further seek costs incurred in defending themselves in the National Century multidistrict litigation.  Here too, it is beyond dispute that the civil claims against Poulsen and Ayers arise from their defrauding of investors.

See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 604 F.Supp.2d 1128, 1145 (S.D. Ohio 2009) ("Indeed, in the court's experience with overseeing the National Century multidistrict litigation, the common thread connecting the various cases included in the litigation is the allegation that it was the Founders [Poulsen, Ayers, and Parrett] who orchestrated this massive fraud of nearly $3 billion.")

The Principals' counter-argument fails to persuade. They argue that their convictions are not "final," meaning that Great American must pay until the cases are resolved in a final adjudication. At the time they filed their briefs, they argued that "final" meant that "the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari elapsed or [was] . . . denied." Ayers Reply Br., p. 4 (quoting Tehan v. United States, 382 U.S. 406, 409 n.3 (1966)).

Even by the Principals' own definition, the convictions of Ayers, Faulkenberry, and Dierker are now final. The Sixth Circuit has affirmed their convictions for securities fraud, wire fraud, and conspiracy, and the time has lapsed for them to petition for a writ of certiorari from the United States Supreme Court. U.S. v. Faulkenberry, 614 F.3d 573 (6th Cir. 2010); U.S. v. Ayers, 386 Fed. App'x 558 (6th Cir. July 28, 2010); U.S. v. Dierker, 417 Fed. App'x 515 (6th Cir. April 1, 2011). What is left on appeal for Ayers, Faulkenberry, and Dierker are their amended sentences.

That leaves Poulsen, whose conviction and sentence was affirmed by the Sixth Circuit on August 25, 2011, such that he still has time to seek review by the Supreme Court. But the language of the policy makes clear that the type of finality espoused by the Principals – exhaustion of appellate review – is not required to trigger the dishonesty exclusion. Rather, the policy requires simply "a judgment or other final adjudication adverse to such Insured" establishing deliberately fraudulent or deliberately dishonest acts, omissions, or purposeful violations. Gulf Policy, §4.I.1 (emphasis added). The policy speaks nothing of exhaustion of appellate review. The conviction, sentence, and judgment rendered by this court against Poulsen was a final judgment that imposed criminal penalties upon him. See Berman v. United States, 302 U.S. 211, 212 (1937) ("Final judgment in a criminal case means

29

sentence. ").  Other cases addressing this issue – though admittedly not Ohio cases – have held that insurance coverage is excluded when there is a criminal conviction establishing fraud or dishonesty.  See, e.g., Pacific Ins. Co. v. General Dev. Corp., 28 F.3d 1093, 1096 (11th Cir. 1994) (holding that the "judgment" language of an insurance policy's dishonesty exclusion was satisfied by a conviction of fraud and conspiracy); U.S. v. Weissman, No. S2 94-cr-760, 1997 WL 334966, at **9-13 (S.D.N.Y. June 16, 1997) (holding that the "judgment or other final adjudication" language of a dishonesty exclusion was satisfied by a criminal conviction); Fidelity and Deposit Co. of Maryland v. Jernagan, No. PCA 87-30080-WS, 1987 WL 49657, at *1 (N.D. Fla. July 5, 1987) (holding that guilty plea to crime of fraud satisfied "judgment or final adjudication" language of dishonesty exclusion); Chubb Custom Ins. Co. v. Triumph Capital Group, Inc. , No. 04-1893-BLS2, 2007 WL 799906, at *3 (Mass. Super. Ct. Feb. 9, 2007) ("[T]he phrase 'judgment or other final adjudication' is disjunctive, so a judgment of conviction would still be sufficient by itself to bar coverage even if it were not a final adjudication.  [In addition], a judgment is indeed a final adjudication – not final in the sense of bringing final closure to a criminal case, but final in the sense that the consequences of a criminal conviction may now be imposed and the case is ripe for appeal.").

The Sixth Circuit too, in the civil context, has held that even a default judgment in a civil case is a "judgment" and is "final" within the meaning of a dishonesty exclusion having the same "judgment or other final adjudication" language as the Gulf policy here does.  Rice v. Liberty Surplus Ins. Corp., 113 Fed. App'x 116, 122-23 (6th Cir. 2004) (applying Tennessee law).

The court notes that Dierker submitted a brief opposing Great American's motion against him. He argues that he should not be held accountable for Lance Poulsen's criminal conviction, nor for facts stemming from Poulsen's criminal trial.  And he attempts to dispute facts from his and Lance Poulsen's criminal trials.  The court need not go through a detailed summary of Dierker's assertions, as he presents no additional theories having any legal merit.  Particularly fatal to his position is that all of his arguments

30

fail to address one important point: that he too was convicted, with finality on direct appeal of a crime involving willful dishonesty and fraud.  See Dierker, 417 Fed. App'x at 519 ("Ample evidence and testimony indicated, however, that Dierker did knowingly join in the conspiracy to defraud investors."); see also Rice, 113 Fed. App'x at 123 (dishonesty exclusion satisfied where the insured willfully engaged in civil conspiracy to defraud).  This alone means he is subject to the dishonesty exclusion in Great American's policy.

### 2.    Applied to the UAT

Great American argues that the dishonesty exclusion applies to the UAT by imputation. Generally, a principal is liable for the knowledge received and the conduct committed by an agent within the scope of employment.  Losito v. Kruse, 136 Ohio St. 183, 187-88, 24 N.E.2d 705, 707 (Ohio 1940); Clark v. Southview Hosp. & Family Health Ctr., 68 Ohio St.3d 435, 438, 628 N.E.2d 46, 48 (Ohio 1994); Leak v. Lexington Ins. Co., 641 F. Supp. 2d 671, 678 (S.D. Ohio 2009).  Great American argues that the fraud of the Principals must be imputed to National Century as the principal entity and thereby deprive it of coverage.

The UAT agrees to the facts concerning the Principals' fraudulent conduct.  It argues that their conduct, however, cannot be imputed to the UAT because of the adverse interest exception, whereby conduct is not imputed if the agent acted adversely to the principal and entirely for his own, or another's, purpose.  First Nat'l Bank of New Bremen v. Burns, 88 Ohio St. 434, 438, 103 N.E. 93, 94 (Ohio 1913); Burger v. Board of Liquor Control, 135 N.E.2d 786, 787 (Ohio Ct. App. 1955); In re Motorwerks, Inc., 371 B.R. 281, 291 n. 6 (Bankr. S.D. Ohio 2007); see also Collins v. Pioneer Title Ins. Co., 629 F.2d 429, 436 (6th Cir. 1980) ("The principal is not ordinarily charged with the knowledge of the agent in a matter where the agent's interests are adverse to those of the principal.").   Under this exception, the independent fraud of an agent acting "'on his own account'" will not ordinarily be imputed to the principal.  Aetna Cas. and Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 541-42 (6th Cir.

2000) (quoting Am. Export & Inland Coal Corp. v. Matthew Addy Co., 112 Ohio St. 186, 198, 147 N.E.
89, 92-93 (Ohio 1925)).  The UAT argues that the Principals' wrongdoing which brought about the loss
should not be imputed to National Century because it entailed massive looting of corporate assets,
conduct which was adverse to the company.  See Baena v. KPMG LLP, 453 F.3d 1, 8 (1st Cir. 2006)
(characterizing an agent's looting of corporate assets as a "classic example" of an action that is adverse
to the principal).

 Great American in turn contends that the adverse interest exception is overcome by the sole
actor rule.  Under this rule, an agent's wrongdoing is directly attributed to the principal if he "so
dominated and controlled" the principal that it "had no separate mind, will, or existence of its own."
In re Dublin Securities, Inc., 133 F.3d 377, 380 (6th Cir. 1997) (applying Ohio law).  The sole actor rule
inquires into whether "the principal and agent are one and the same"or are "alter egos."  First Nat'l
Bank, 88 Ohio St. at 443-44, 103 N.E. at 95; see also Official Comm. of Unsecured Creditors of Color
Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 165 (2d Cir. 2003); In re NM Holdings Co., LLC,
622 F.3d 613, 620-31 (6th Cir. 2010) ("The sole actor rule comes into play where the wrongdoer is, in
essence, the corporation.") (internal quotation marks omitted); Fine v. Sovereign Bank, 634 F. Supp.
2d 126, 139 (D. Mass. 2008) ("Where a corporation's agent effectively is himself the corporation –
where the actor and the corporation are alter egos – even acts that harm the corporation cannot be
considered 'adverse.'").

 This legal terrain is well-traveled by the court.  See, e.g., In re Nat'l Century Fin. Enterprises,
Inc., Inv. Litig., __ F.Supp.2d __, 2011 WL 1397813 (S.D. Ohio 2011).  In that decision, the court
found as a matter of law that National Century's wrongdoing agents – Poulsen especially – were sole
actors who dominated and controlled National Century's note-issuing subsidiaries, NPF VI and NPF
XII.  And so their wrongdoing was imputed to NPF VI and NPF XII, in whose shoes the UAT stood
in that action against an investment bank which sold the notes.

The same conclusion must be reached in the present case, but with a few wrinkles.  The UAT here stands not only in the shoes of NPF VI and NPF XII but also of National Century.  See Debtors' Second Am. Compl., filed in Bankruptcy Ct. on Sept. 17, 2003 (complaint of the debtors asserting a claim for coverage under the Gulf and Great American policies on behalf of National Century and its subsidiaries, including NPF VI and NPF XII).  One might argue that a finding that Poulsen, Ayers, and Parrett dominated the subsidiaries does not necessarily extend to a finding that they so dominated National Century.  However, there are three reasons why this argument fails.  For one, the facts proved beyond a reasonable doubt in the criminal proceedings thoroughly establish that Poulsen and those under him dominated and controlled National Century.  As Judge Marbley stated to Poulsen at his sentencing hearing, "nothing happen[ed] without your blessing at NCFE, and when you didn't have the authority to . . . do the improper advances yourself, you conferred that authority upon others. . . . [Y]ou were the puppet master."  U.S. v. Poulsen, No. 2:06-cr-129 (S.D. Ohio) at doc. 989, p. 45; see also at pp. 40-44 (summarizing the evidence as to the nature and circumstances of the offense and noting that Poulsen conceived of and directed the fraud for seven years).

Second, to the extent National Century's ring of management was larger than that of NPF VI and NPF XII, those additional individuals in authority – Faulkenberry, Dierker, Sherry Gibson,  John Snoble, Randolph Speer, Jon Beacham, Brian Stucke – all have been proved in criminal proceedings to have knowingly participated in the fraud.  See U.S. v. Faulkenberry, 2:06-cr-129-4 (S.D. Ohio); U.S. v. Dierker, 2:06-cr-6 (S.D. Ohio); U.S. v. Gibson, 2:03-cr-119 (S.D. Ohio); U.S. v. Snoble, 2:04-cr-193 (S.D. Ohio); U.S. v. Speer, 2:06-cr-129-5 (S.D. Ohio); U.S. v. Beacham, 2:06-cr-129-7 (S.D. Ohio); U.S. v. Stucke, 2:03-cr-207 (S.D. Ohio).  And application of the sole actor rule is not negated because multiple wrongdoers committed the fraud.  See Dublin Securities, 133 F.3d at 380 (applying the doctrine of in pari delicto where wrongdoing officers and directors, as a group, dominated and controlled the corporation); Baena, 453 F.3d at 6-7 (same).  The rule applies to a corporation controlled by multiple

33

individuals so long as all relevant decision-makers "were involved together in the fraud against the corporation." In re CBI Holding Co., Inc., 311 B.R. 350, 373 (Bankr. S.D.N.Y. 2004), aff'd in part, rev'd on other grounds, 529 F.3d 432 (2d Cir. 2008).  Here, the small group of individuals who were the founders, executives, officers, and owners of National Century, NPF VI, and NPF XII all worked together under Poulsen's direction to commit the fraud.  See Poulsen, 568 F.Supp.2d at 895 (stating that, based on the evidence submitted in the criminal proceedings, National Century's compliance department appeared to have no other purpose than to cover up the fraud committed by the company).

Third, the claim for insurance coverage pursued by the UAT arises from the wrongful acts of fraud committed by National Century through NPF VI and NPF XII.  The harm done was to the holders of NPF VI and NPF XII notes, and it was against these creditors' claims that the debtors had to defend themselves, thereby causing them to seek entity coverage under the D&O policies.  See Debtors' Second Am. Compl.  Even after the bankruptcy court narrowed the universe of outstanding bankruptcy claims against the debtors down to what was known as the Noteholder Deficiency Claim, what remained was the $2.6 billion in tort claims that the holders of NPF VI and NPF XII notes had against the debtors.[2]  It is this $2.6 billion loss for which the UAT is seeking coverage under the Great American policy.  At its core, the loss necessarily relates to the wrongdoing that Poulsen and the other agents accomplished through NPF VI, NPF XII, and another subsidiary, National Premier Financial Services, Inc., which the court found was also fully dominated by Poulsen and his cohorts.  See In re Nat'l Century Fin. Enterprises, 2011 WL 1397813, at *13.

In opposing application of the sole actor rule, the UAT looks to the "innocent insider" exception, arguing that National Century's Outside Directors could have stopped the fraud had they

---

[2]  As of the bankruptcy petition date, the outstanding amount owed to NPF VI and NPF XII noteholders was about $3 billion.  There was $400 million recovered in collateral, which was used to settle the noteholders' contractual claims against the debtors.  The noteholders' tort claims were allowed in bankruptcy court as a Noteholder Deficiency Claim in the amount of $2.6 billion.

known about it.[3]  There are no Ohio cases adopting this exception.  Cf. In re NM Holdings Co., LLC, 405 B.R. 830, 862 (Bankr. E.D. Mich. 2008) (rejecting the innocent insider exception because no Michigan court had adopted it), aff'd 622 F.3d 613 (6th Cir. 2010).  Rather, the UAT cites to a New York case describing the exception as follows: "The innocent insider exception is a corollary to the sole actor rule.  If other managers or owners – besides the bad actor – control the company, it necessarily follows that the company and the agent are not the same entity; because the principal and the agent are not the same, the sole actor rule cannot apply. . . .  The touchstone of the innocent insider exception is control. If an innocent person inside the corporation had the power to stop the fraud, the agent and the company are not mere alter egos, so the sole actor rule cannot apply."  In re 1031 Tax Group, LLC, 420 B.R. 178, 202-03 (Bankr. S.D.N.Y. 2009) (internal citations omitted).

        What is lacking from the UAT's innocent insider argument is any explanation or proof of what the Outside Directors could have done to prevent the fraud.  They did not occupy a majority position on the board, and there is no evidence that they had any meaningful control or influence.  Nor is it obvious that they were "innocents."  See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 504 F.Supp.2d 287 (S.D. Ohio 2007) (allowing certain claims brought by investors to go forward against the Outside Directors for their alleged involvement in the fraud; these claims were later settled).  Further, the fraud began no later than 1995, well before the Outside Directors were even appointed.  The evidence is unmistakable that Poulsen and his cohorts ran National Century as a massive fraudulent scheme and that there was nothing the Outside Directors had the power to accomplish internally that would have preserved National Century as a legitimate business.  Simply put, there is no genuine issue

---

[3]  The UAT also argues that the existence of certain internal controls – put in place to supposedly keep the operations of NPF VI and NPF XII in check – prevents a conclusion that Poulsen and the other wrongdoers had complete control and domination over those note programs.  The court has rejected this argument for reasons fully explained in In re Nat'l Century Fin. Enterprises, 2011 WL 1397813, at **12-15.

of fact sufficient to deny the motion for summary judgment on the grounds of the "innocent insider" exception.

Accordingly, the court finds that the Principals' fraudulent conduct must be imputed to National Century and its subsidiaries for purposes of excluding those entities from coverage under the policy's dishonesty clause.

**V.    Conclusion**

For the reasons set forth above, the Principal's motions for summary judgment (docs. 56, 63) are DENIED.  Great American's motion for summary judgment that Ayers, Faulkenberry, and Dierker are excluded from coverage under the dishonesty exclusion (doc. 89) is GRANTED.  Great American's second motion for summary judgment (doc. 96) is DENIED with respect to Great American's claim that it may rescind the policy as void *ab initio*, but GRANTED with respect to its claim that Poulsen and the UAT are excluded from coverage under the dishonesty exclusion.

This leaves the Outside Directors and Barbara Poulsen as potential claimants to the D&O policy proceeds.  The remaining parties will have until December 31, 2011 to complete discovery.  A notice of the final pretrial conference and trial dates is forthcoming.

<div style="margin-left:50%">

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

</div>

DATE: September 16, 2011